## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| DANZIGER & DE LLANO, LLP | : | Judge Petrese B. Tucker |
|  | : |  |
| *Plaintiff* | : |  |
|  | : |  |
| v. | : |  |
|  | : | Case No.:  2:18-cv-002082 |
| MORGAN VERKAMP, LLC, | : |  |
| FREDERICK M. MORGAN, JR., | : |  |
| ESQUIRE, and | : |  |
| JENNIFER VERKAMP, ESQUIRE | : | JURY TRIAL DEMANDED |
|  | : |  |
| *Defendants* | : |  |

### AMENDED COMPLAINT

**AND NOW**, comes Plaintiff, Danziger & De Llano, LLP, by and through undersigned counsel, Bochetto & Lentz, P.C., and avers as follows in support of its Amended Complaint against all Defendants:

### I. PARTIES

1.    Plaintiff, Danziger & De Llano, LLP, ("DD" or "Plaintiff") is a Texas limited liability partnership with a principal place of business located at 440 Louisiana Street, Suite 1212, Houston, TX 77002.  DD is a law firm that represents clients in product liability cases and has represented clients in whistleblower litigation.  At all times relevant to this action, the principals of Plaintiff are Paul Danziger, Esquire ("Danziger") and Rod de Llano, Esquire ("De Llano").

2.    Defendant Morgan Verkamp, LLC ("MV") is an Ohio limited liability company organized on or about December 31, 2007, with a principal place of business located at 35 E. 7th

Street, Suite 600, Cincinnati Ohio 45202.  MV focuses its practice on *qui tam* cases under the False Claims Act.

3.     Defendant Frederick M. Morgan, Jr., Esquire ("Morgan") is an adult individual who may be served at 35 E. 7th Street, Suite 600, Cincinnati Ohio 45202.  Morgan is licensed to practice law in the State of Ohio and focuses his practice on *qui tam* cases under the False Claims Act for MV.  Upon information and belief, Morgan is a member of MV.

4.     Defendant Jennifer Verkamp, Esquire ("Verkamp") is an adult individual who may be served at 35 E. 7th Street, Suite 600, Cincinnati Ohio 45202.  Verkamp is licensed to practice law in the State of Ohio and focuses her practice on *qui tam* cases under the False Claims Act for MV.  Upon information and belief, Verkamp is a member of MV.  MV, Morgan and Verkamp are collectively referred to herein as "Defendants."

## II.     JURISDICTION AND VENUE

5.     The subject matter jurisdiction of this Court is based upon 28 U.S.C. §1332, in that there is complete diversity of citizenship among the parties, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, in that a substantial part of the events giving rise to this action occurred in this District.

7.     Defendants routinely practice law in the United States District Court for the Eastern District of Pennsylvania.

### III.   FACTUAL ALLEGATIONS

#### Introduction

8.      This is a conversion, fraud, unjust enrichment, breach of contract and tortious interference with contractual and prospective relations action arising out of Defendants' unlawful refusal to pay approximately $2,133,333 in legal fees as set forth more fully below.

9.      Remarkably, this is not the first time Plaintiff was forced to initiate a lawsuit against Defendants in order to resolve a legal fee dispute.

10.     This is not a professional negligence claim but rather a claim of willful and intentional misconduct in violation of State and Federal criminal law.

11.     In April 2007, Plaintiff referred a client, Michael Epp ("Epp"), to Defendants and began working alongside Defendants as co-counsel to provide legal representation to Epp over a period of many months, at least through January 2008. During this time frame it was agreed that Plaintiff would refer Epp as a *qui tam* Plaintiff to Defendants with the understanding that Plaintiff would be paid one-third of the total fee in Epp's case.

12.     After the case was referred and a co-counsel fee agreement was presented to Epp, it appeared that Epp had decided not to proceed with the potential litigation at that time.

13.     Approximately two years later; however, Plaintiff saw a press release of a *qui tam* settlement and sent an email to Defendants inquiring whether this was the Epp case.

14.     Morgan deflected, by responding, "Thank heavens, no.  Michael Epp worked with something like United Food Service."

15.     Because Plaintiff implicitly trusted Defendants due to years of an ongoing business of referring clients to Defendants in return for referral fees (as set forth below), Plaintiff had no reason to believe Defendants would represent Epp without informing Plaintiff.

3

16.     In or about October 2016, Plaintiff learned Defendants had willfully deceived Plaintiff – Defendants did in fact represent Epp in a False Claims Act case.

17.     The *qui tam* case, *United States ex rel. Epp v. Supreme Foodservice A.G.*, No. 10-CV-1134, was filed on March 16, 2010 in the United States District Court for the Eastern District of Pennsylvania; two months after the exchange of emails regarding Epp.

18.     Based upon the claims Epp had reviewed with Plaintiff and which were referred to Defendants, MV recovered approximately $434 million and the Department of Justice awarded Epp $16 million and agreed to pay MV an additional $1.1 million in legal fees.

19.     Based on the longstanding course of conduct between Plaintiff and Defendants by previous client referrals, Defendants owe Plaintiff approximately $2,133,333 in legal fees for the co-counsel referral of the Epp matter to Defendants.

20.     Defendants fraudulently concealed their representation of Epp despite continued communications with Plaintiff during the entire pendency of the Epp litigation while they worked together as co-counsel on other cases referred by Plaintiff.

## REFERRAL RELATIONSHIP BETWEEN THE PARTIES

21.     In 2005, Plaintiff introduced a potential *qui tam* matter to Morgan while he was a partner at Volkema Thomas, an Ohio law firm.

22.     After an investigation, this matter was not pursued.

23.     In 2006, Plaintiff introduced another potential *qui tam* relator to Morgan and Verkamp while they were partners at Volkema Thomas.

24.     After an investigation, it was determined that this was a viable case and on June 6, 2006, the relator, Stacy Vanderslice ("Vanderslice"), Volkema Thomas and Plaintiff entered into a fee agreement.

4

25.     According to the fee agreement, the relator would share 40% of any recovery she received with her attorney team, who, in turn, agreed to allocate their share of the contingent fee recovery as follows: 33% to Volkema Thomas (by and through Morgan), 33% to Plaintiff, and 34% to be allocated in proportion to the hours spent by each law firm in connection with the representation of the Plaintiff.

26.     Volkema Thomas (by and through Morgan) filed the Vanderslice complaint in federal court in Dallas, Texas in 2006 and Plaintiff served as local counsel.

27.     In January 2008, Morgan and Verkamp left Volkema Thomas and started MV. Thereafter, MV substituted as lead counsel for Vanderslice and Volkema Thomas withdrew as counsel of record.

28.     From 2006 through 2011, Plaintiff and Defendants worked as co-counsel with each other on this matter until it was settled in approximately April 2011.

29.     Upon the settlement, Defendants paid Plaintiff in accordance with the Vanderslice Agreement.

30.     About the same time that Vanderslice contacted Plaintiff in 2006, Plaintiff was contacted by Donald Galmines ("Galmines"), a potential *qui tam* relator who had information against Novartis for allegedly promoting off-label usage of a drug.

31.     After completing an initial investigation, Plaintiff contacted Morgan in May 2006 to discuss the Galmines claim.

32.     After numerous conference calls with Galmines and by and between Plaintiff and Morgan in June 2006, Galmines, Volkema Thomas (by and through Morgan) and Plaintiff entered into a fee agreement much like the Vanderslice Agreement.

33.     The Galmines Agreement provided that attorneys' fees paid by defendants in the event of a successful conclusion of the action based on hours expended were part of the fee agreement and that the relator would share 40% of any recovery he received with the attorney team who, in turn, agreed to allocate their share of the contingent fee recovery as follows: 33% to Volkema Thomas (by and through Morgan), 33% to Plaintiff, and 34% to be allocated in proportion to the hours spent by each law firm in connection with the representation of the Plaintiff.

34.     In July 2006, Volkema Thomas filed a complaint on behalf of Galmines in the United States District Court for the Eastern District of Pennsylvania.  Plaintiff was not listed as counsel on any of the pleadings.

35.     Again, in January 2008, Morgan and Verkamp left Volkema Thomas and started MV.  Thereafter, MV substituted as lead counsel for Galmines and Volkema Thomas withdrew as counsel of record.

36.     In May 2009, Morgan advised Plaintiff that Galmines would be filing a separate action in Texas state court under the Texas False Claims Act. Plaintiff served as local counsel and worked alongside Morgan and other MV attorneys.

37.     In 2012, when the Texas state court action was settled, MV (by and through Verkamp) arranged to pay Plaintiff its share of the contingent fee recovery in accordance with the Galmines Agreement.

38.     In September 2016, Plaintiff received a letter from MV, signed by Morgan, advising Plaintiff that MV had been successful in its representation of Galmines and that a contingent fee of $4,478,649.25 was earned.

39.     In this letter, however, MV indicated it could not honor the Galmines Agreement due to ethical concerns and the fee would not be paid to Plaintiff.

40.     Thereafter, on October 6, 2016, Plaintiff filed suit against Defendants in the Philadelphia Court of Common Pleas via writ of summons to recover its earned fee pursuant to the Galmines Agreement; *Danzinger* (sic) *& De Llano, LLP v. Morgan Verkamp, LLC, Jennifer Verkamp, Esquire, Frederick M. Morgan, Jr., Esquire*, Case No. 161000714 ("Philadelphia Action").

41.     On or about December 8, 2016, the parties entered into a confidential settlement agreement and thereafter, on December 12, 2016, the Philadelphia Action was ended by way of praecipe.

42.     Accordingly, the Philadelphia Action was resolved to Plaintiff's satisfaction.

## PLAINTIFF ORIGINATES EPP AS A CLIENT

43.     While the Vanderslice and Galmines matters were proceeding by and between Plaintiff, Morgan and Verkamp, on April 14, 2007, Epp accessed Plaintiff's website and filled out a form with his contact information and provided details of fraudulent practices which cost the United States millions of dollars. (A redacted copy of the April 14, 2007 communication is attached hereto as Exhibit "1.")

44.     Within hours, De Llano promptly responded to Epp by way of email as follows:

> Our firm is interested in discussing this with you further. We have been involved in several large qui tam cases, including a case against Pfizer, which settled for $49M. In addition, we would be partnering with Volkema Thomas (vt-law.com) in the investigation and, if warranted, prosecution of the case. Volkema Thomas has 3 partners whose practice is almost exclusively dedicated to qui tam cases.

(*Id.*)

45.     At the time of the initial co-counsel referral of this client, Morgan and Verkamp were affiliated with Volkema Thomas.

46.     The same day Plaintiff received the contact from Epp, Plaintiff, by and through De Llano, sent an email to Morgan and Verkamp at their firm, Volkema Thomas, asking a question on behalf of Epp.

47.     On April 15, 2007, Epp responded to De Llano, thanking him for his quick response and noting that such response "shows your interest in the case to me." (*Id.*)

48.     The following day, De Llano responded to Epp and discussed the scheduling of a conference call which would include Volkema Thomas attorneys. At this point in time, Epp was communicating solely with Plaintiff's principal, De Llano.

49.     On April 19, 2007, by and through the efforts of Plaintiff, a conference call was convened between De Llano, Morgan, Verkamp and Epp to discuss the factual basis for a *qui tam* action under the False Claims Act.

50.     At the conclusion of the April 19, 2007 conference call, De Llano sent Morgan an outline of the issues discussed during the call.

51.     Thereafter, on April 20, 2007, De Llano sent a summary of contract information on Epp's employer, Supreme FoodService, to Morgan and other attorneys at Volkema Thomas. The email references "Michael Epp." (A redacted copy of the April 20, 2007 communication is attached hereto as Exhibit "2 .")

52.     On April 23, 2007, Epp sent an email to Plaintiff and Morgan about "Qui Tam." Therein, Epp asked, "...who is going to pay your legal fees?" (A redacted copy of the April 23, 2007 communication is attached hereto as Exhibit "3.")

8

53.     In response, De Llano sent an email to Morgan asking whether Morgan would like De Llano to respond to Epp's questions.  (*Id.*)

54.     Morgan responded to Epp's email and copied De Llano, in pertinent part, as follows:

> If there is no recovery, our fees are unpaid…. If there is a recovery, our contingent share is disbursed therefrom and the defendant is responsible to pay the hourly legal fees.

(*Id.*)

55.     On April 27, 2007, Epp emailed a "narrative" to De Llano and Morgan.  Therein, Epp made the following request of De Llano:

> Rod, please check with Rick whether he has received this mail as usually my mails to him are rejected for any reason.

(A redacted copy of the April 27, 2007 communication is attached hereto as Exhibit "4.")

56.     In accordance with Epp's request, De Llano forwarded the email to Morgan.  This occurred on other occasions as well.

57.     Unable to open the email, Morgan responded with a request that De Llano send an "unzipped version" of the narrative.  (*Id.*)  De Llano complied with Morgan's request.

58.     On May 3, 2007, Epp notified De Llano that he was ready with the 40 page narrative of the factual basis for the *qui tam* action and requested De Llano call Epp's cell phone on May 4, 2007.  (*Id.*)

59.     Thereafter, De Llano contacted Morgan to inquire about Morgan's availability for the call, noting, "I think it will be an important call."  (*Id.*)

60.     In response, Morgan indicated he was not prepared for the call due to other work commitments and suggested alternative dates, "if my participation is necessary." (*Id.*)

61.     Urging Morgan to make himself available for the call, De Llano responded, "Rick, he has some specific things he wants to discuss with us, which I am assuming are about the process and about his situation right now." (*Id.*)

62.     Due to Morgan's conflicts, De Llano rescheduled the conference call with Epp. Morgan replied, "thanks for working this around for us, Rod." (*Id.*)

63.     On May 7, 2007, a conference call was convened between Epp, Morgan and De Llano to discuss various issues regarding the legal representation of Epp and the underlying fact pattern detailed in the Epp narrative.

64.     On May 12, 2007, Epp contacted De Llano and Morgan and asked that De Llano set up a conference call for the middle of the following week. (A true and correct copy of the email is attached hereto as Exhibit "5.")

65.     When it was determined by De Llano that Morgan could not make the call as proposed, De Llano contacted Epp to reschedule the conference call to accommodate Morgan. (A true and correct copy of the May 13, 2007 email is attached hereto as Exhibit "6.")

66.     On May 16, 2007, De Llano sent an email to Morgan and other attorneys from his firm about their availability for a conference call with Epp.  In it, De Llano expressed the following concerns:

**I am worried that Mr. Epp will think we're not moving quickly enough.**
(A true and correct copy of the May 16, 2007 email is attached hereto as Exhibit "7.")(Emphasis added.)

67.     On May 20, 2007, De Llano sent an email to Epp advising him about the difficulty in getting everyone together at one time due to numerous conflicts.  De Llano further stated:

10

> Rick Morgan, Craig Scott and I will be talking about your case on Monday
> morning in order to decide on a course of action and determine what
> additional information we'll need to move forward on your case.

(A true and correct copy of the May 20, 2007 email is attached hereto as Exhibit "8.")

68.     On May 21, 2007, De Llano contacted Epp to inquire whether he had collected
the significant documents as previously discussed. (*Id.*)

69.     Epp responded that he had pre-selected documents and would like De Llano's
"feedback" in order to finalize the documentation. (*Id.*)

70.     On May 21, 2007, Epp, De Llano, and Morgan convened a conference call to
discuss the draft complaint and the fee agreement.

71.     On May 22, 2007, De Llano and Epp spoke on a conference call in which
additional information was provided to Epp about the case and the representation.

72.     Later that same day, De Llano and Morgan discussed the fee splitting
arrangement between their two firms. During this discussion it was agreed that any recovery on
behalf of Epp would be divided in accordance with their previous co-counsel practice: 1/3 to
Plaintiff, 1/3 to the firm and 1/3 based on hours worked on the case.

73.     On May 27, 2007, Epp sent an email to De Llano requesting a draft fee contract.
(*Id.*)

74.     Morgan responded to Epp's email and stated, "The ball is in my court on the
contract, I took lat (sic) Thursday and Friday off and did not get the document out . . . my
apologies for the delay." (*Id.*)

75.     On May 30, 2007, Morgan prepared and sent Epp a draft fee agreement with
terms almost identical to the Vanderslice and Galmines Agreements. Therein, Morgan pointed
out that the draft agreement "does not include the details of the relationship between Rod's and

our firms, which also will be subject to your approval." (A true and correct copy of the May 30,

2007 email and draft fee agreement is attached hereto as Exhibit "9.")

76.     Throughout the May 30, 2007 draft fee agreement there are numerous reference to

"our" and "we" and the signature lines on the draft indicate the agreement is between Epp and

Volkema Thomas, LLP by Frederick M. Morgan, Jr. **and Danziger & De Llano by Rod D**

**Llano**. (*See* Exhibit "9.")(Emphasis added.)

77.     The May 30, 2007 draft fee agreement also provides as follows:

> 5.  Each law firm has agreed to divide any recovery of attorney's fees
> generated from the contingent portion of the relators' share of any award (as
> described above) in the following manner:
> a. _____ percent (__%) of the fees generated by the contingent
> portion of the relators' of any recovery shall be paid to Volkema Thomas,
> LPA.
> b. _____ percent (__%) of the fees generated by the contingent
> portion of the relators' of any recovery shall be paid to Danziger & De
> Llano, P.C.

(*See* Exhibit "9," p. 3, #5.)

78.     Morgan noted in the draft fee agreement that Epp had a "potentially-strong case."

(*Id*.)

79.     On May 31, 2007, Epp contacted De Llano and Morgan with numerous questions

about the draft fee agreement. (A redacted copy of the May 31, 2007 email is attached hereto as

Exhibit "10.")

80.     Thereafter, Morgan replied he would respond to Epp's questions over the

weekend. (*Id*.)

81.     On Monday, June 4, 2007, after Morgan failed to respond to Epp's email over the

weekend, Epp contacted Morgan (and copied De Llano) asking when he could expect to hear

from Morgan. (A true and correct copy of the June 4, 2007 email is attached hereto as Exhibit "11.")

82.     Later that day, Morgan finally responded to Epp's questions with a five page letter. The letter, among other things, clarified that the contingency fee to be charged Epp in the event of a recovery would be 40% of the relator's fee as well as attorneys' fees for attorney time and billable staff. (A redacted copy of the June 4, 2007 email and letter is attached hereto as Exhibit "12.")

83.     On June 13, 2007, Epp sent an email to De Llano and Morgan inquiring about potential conflicts between U.S. and German law. (A redacted copy of the June 13, 2007 email and letter is attached hereto as Exhibit "13.")

84.     On June 21, 2007, concerned that he had not heard anything from Epp, Plaintiff, by and through De Llano, sent an email to Morgan asking whether Morgan had heard anything on the Epp case. (A true and correct copy of the June 21, 2007 email is attached hereto as Exhibit "14.")

85.     On June 22, 2007, Morgan sent an email to De Llano regarding another client referral from Plaintiff to Morgan at Volkema Thomas. In it, Morgan states, "We have not heard from Mr. Epp, and are a tad concerned. I take it you haven't either. **Let's both renew our efforts.**" (A true and correct copy of the June 22, 2007 email is attached hereto as Exhibit "15.")(Emphasis added.)

86.     Thereafter, on June 30, 2007, Morgan sent an email to Epp, and De Llano stating, "We've gone ahead and gotten a running start on the complaint. If it is to be filed before 10 July, we need to know, if even remotely possible, by Monday evening." (A true and correct copy of the June 30, 2007 email is attached hereto as Exhibit "16.")

87.     On or about September 17, 2007, Morgan contacted Epp and De Llano inquiring about their availability for a conference call.  A call was then scheduled for September 21, 2007.

88.     In January 2008, Morgan and Verkamp separated from Volkema Thomas and entered into a separation agreement wherein their new firm, MV, agreed to assume responsibility for various *qui tam* cases and to reimburse Volkema Thomas for case expenses.  The separation agreement included the following cases: Epp, Vanderslice and Galmines.  (A true and correct copy of a redacted page from the separation agreement is attached hereto as Exhibit 17.)

89.     On January 13, 2008, Morgan sent an email to Epp and De Llano advising them that he and Verkamp started their own firm and that their contact information had changed. Therein, Morgan states,

> As I am no longer affiliated with Volkema Thomas, the draft contract [draft fee agreement] I sent you several months ago is no longer relevant.  **Let Rod and me know if we can be of further service.**

(A true and correct copy of the January 13, 2008 email is attached hereto as Exhibit "18.")(Emphasis added.)

90.     Epp promptly responded to Morgan (and copied De Llano) and asked: "are you interested to take over the case on the same basis as Volkema Thomas?"  (*Id.*)

91.     On January 15, 2008, Morgan responded (and copied De Llano) as follows:

> Michael, we are doing the same work in the same place, and **definitely remain interested in your case.  The terms were ours to begin with,** so while we would need to reacquaint ourselves with the case and still would need to obtain the rest of your materials for review, **if we were to handle your case <u>we would do it on the same terms</u>**.

(A true and correct copy of the January 15, 2008 email is attached hereto as Exhibit "19.")(Emphasis added.)

92.     While Plaintiff never heard back from Epp, Plaintiff continued to communicate with Defendants over the ensuing years as they worked together as co-counsel on the Vanderslice and Galmines cases pursuant to the parties' longstanding referral arrangement, as well as communications regarding new potential matters.

93.     On January 14, 2010, Plaintiff, by and through De Llano, sent an email to Morgan inquiring about a press release which detailed a large *qui tam* fraud settlement which appeared to be similar to the Epp fact pattern.  (A true and correct copy of the January 14, 2010 email is attached hereto as Exhibit "20.")

94.     Therein, De Llano inquired as follows:

> Do you remember if this is the same case we looked into a few years back, but the client backed out b/c he wanted to cut a deal with his company? The one where the return email went to his buz address, so the company found out?

(*Id.*)

95.     Morgan responded,

> Thank heavens, no.  Michael Epp worked with something like United Food Service.  Funny timing on your email; I was on a conference call with the Texas AG's folks on the Elidel case, which continues to chirp along. Things are within acceptable limits here, you?

(A true and correct copy of the January 14, 2010 email is attached hereto as Exhibit "21.")

96.     Morgan's reference to "the Elidel case" relates to the Galmines matter on which the parties were co-counsel in Texas.

97.     Unbeknownst to Plaintiff, on February 15, 2010, Morgan, on behalf of Defendants, sent a fee contract to Epp and, remarkably, excluded Plaintiff from the email.  (A true and correct copy of the February 15, 2010 email from Morgan to Epp is attached hereto as Exhibit "22.")

98.     Knowing that his exclusion of Plaintiff from this email would likely raise concerns for Epp, Morgan explained his failure to copy Plaintiff's representative, Rod De Llano, as follows:

> I have not included Rod De Llano on this contract, as we have not discussed whether you wish to retain his firm as well as ours.  If you wish me to reach out to Rod to see if he wishes to participate, I will do so.  Otherwise, I will work (sic) him once the case is evolved (sic) **to ensure that he is reasonably compensated** for the work he did for you in 2007.

(*Id.*)

99.     Morgan knew with absolute certainty when he wrote this email that Plaintiff was interested in participating in the representation of Epp.  Plaintiff had consistently expressed interest throughout the joint representation of Epp.  Of course, the earlier fee agreement with Epp included Plaintiff.  (*See* Exhibit "9.")

100.     Moreover, when Morgan rescinded the Volkema Thomas fee agreement, he reiterated that "**if we were to handle your case <u>we would do it on the same terms</u>.**"  (Ex. 19.)

101.     Yet, Morgan, on behalf of all Defendants, lulled Epp into being unconcerned about the absence of Plaintiff from the case due to Defendants' purported intention to compensate Plaintiff -- something Defendants have refused to do.

102.     Nevertheless, by informing Epp that Plaintiff would be compensated for work performed, Defendants acknowledged that Plaintiff had performed legal services for Epp as co-counsel with Defendants and was entitled to legal fees.

103.     Upon information and belief, Epp never voiced an objection to Defendants' intention to compensate Plaintiff and consequently consented to the payment of fees to Plaintiff.

104.     Approximately sixty days later, on March 16, 2010, Defendants filed suit on behalf of Epp in the United States District Court for the Eastern District of Pennsylvania, *United*

*States ex rel. Epp v. Supreme Foodservice A.G.*, No. 10-CV-1134, under the same factual basis

for the *qui tam* filing as discussed between Plaintiff, Epp and Defendants at the time of the

original co-counsel referral.

      105.   Despite the fact that Plaintiff and Defendants were co-counsel on the Vanderslice

and Galmines cases which Plaintiff referred to Defendants, at no time did any of the Defendants

contact Plaintiff to advise Plaintiff that they were proceeding with the representation of Epp in

the *qui tam* action.

      106.   In or about October 2016, while Plaintiff was investigating the Philadelphia

Action (Galmines), Plaintiff learned for the first time that Defendants had in fact represented Epp

in the *qui tam* matter for years.

      107.   At this time, Defendant learned that Plaintiff secured a sizable attorney's fee

award of $6.4 million for work performed on behalf of Epp which should have resulted in

Plaintiff being paid approximately $2,133,333 in fees.

      108.   Upon further investigation, Plaintiff secured and reviewed a copy of the Amended

Complaint filed on behalf of Epp in that action.  Therein, in paragraph 268, Defendants made the

following allegations:

> After his termination, Mr. Epp began to investigate the possibility of filing a
> *qui tam* action under the False Claims Act. As part of his investigation, **Mr.**
> **Epp submitted an online questionnaire to a Texas law firm. Thereafter,**
> **emails were exchanged between Mr. Epp and an attorney in that firm**
> **discussing Supreme's fraud against the United States and the process**
> **for filing a False Claims Act case.** On April 16, 2007, an email from the
> lawyer was directed by an email forwarding rule to Mr. Epp's former email
> address at Supreme. The email, which referenced the "Subject: RE:
> Government Fraud /QuiTam Packet," was thus obtained by Supreme. Soren
> Borup Norgaard, Supreme's Director of Corporate and Legal Affairs,
> replied, stating that Supreme had received the message in error, and that it
> was being forwarded to the correct recipient.

(True and correct copy of the pertinent pages of the Epp Amended Complaint are attached hereto as Exhibit "23.")(Emphasis added.)

109.    Of course, the Texas law firm referenced in the Epp Amended Complaint is Plaintiff.

110.    On December 8, 2016, Plaintiff initiated the instant action via writ of summons in the Montgomery County Court of Common Pleas, *Danziger & DeLlano, LLP v. Morgan Verkamp, LLC, et al.*, No. 2016-29199.

111.    Thereafter, Plaintiff propounded discovery in aid of filing a complaint.

112.    Defendants resisted producing responsive documents about their representation of Epp which resulted in Plaintiff filing a motion to compel more specific discovery responses.

113.    On May 13, 2017, a discovery hearing was held before the Honorable Judge Carluccio.  During the hearing, the Judge reviewed *in camera* numerous documents which were withheld from production by Defendants on the basis of the attorney-client privilege.

114.    Upon the conclusion of the *in camera* review, Judge Carluccio ordered Defendants to produce the February 15, 2010 email from Morgan to Epp wherein Morgan advised Epp he would represent him and "reasonably compensate" Plaintiff.  (*See* Exhibit "22.")

115.    Despite being ordered to produce this email, Defendants filed an appeal to the Pennsylvania Superior Court, Docket No. 1651 EDA 2017, claiming that this email was privileged and should not be produced to Plaintiff.

116.    On October 17, 2017, Judge Carluccio issued her Opinion.  (A true and correct copy of Judge Carluccio's Opinion is attached hereto as Exhibit "24.")

117.     Therein, the Court concluded that the email was not protected by the attorney-client privilege and the "generic e-mail was nothing more than client identification and attorney employment . . ." (*Id.* 6)

118.     For emphasis that this email was not privileged, the Court quoted the entire email in the Opinion. (*Id.*) Thereafter, Defendants promptly withdrew their appeal and were forced to produce this email to Plaintiff. (Ex. "21.")

119.     Ohio Rules of Professional Conduct explicitly provide that the rules of professional conduct of the jurisdiction in which the tribunal sits governs any conduct in connection with the matter pending before the tribunal, unless the rules of the jurisdiction provide otherwise. OH ST RPC Rule 8.5(b)(1).

120.     These same Rules also specify that for "any other conduct, the rules of the jurisdiction in which the lawyer's conduct occurred, or, if the predominant effect of the conduct is in a different jurisdiction, the rules of that jurisdiction shall be applied to the conduct." OH ST RPC Rule 8.5(b)(2).

121.     The Supreme Court of Pennsylvania has adopted a choice of law provision which is identical in all respects to the State of Ohio's Rules of Professional Conduct, Rule 8.5. *See* PA RPC 8.5.

122.     Defendants filed, litigated and settled the Epp matter entirely before the United States District Court for the Eastern District of Pennsylvania.

123.     The Local Rules of the U.S. District Court for the Eastern District of Pennsylvania expressly adopt the "Rules of Professional Conduct adopted by the Supreme Court of Pennsylvania." Local Rule Civ. Rule 83.6, Rule IV B.

19

124. Accordingly, the Pennsylvania Rules of Professional Conduct apply to the matters set forth herein.

125. Pennsylvania Rule of Professional Conduct, Rule 1.5(e) permits the division of a fee between attorneys not in the same firm regardless of the quantum of services provided by each attorney:

> A lawyer shall not divide a fee for legal services with another lawyer who is not in the same firm unless: (1) the client is advised of and does not object to the participation of all the lawyers involved, and (2) the total fee of the lawyers is not illegal or clearly excessive for all legal services they rendered the client.

PA RPC 1.5(e).

126. As a consequence of the Epp matter being litigated and resolved in the U.S. District Court for the Eastern District of Pennsylvania where the Pennsylvania Rules of Professional Conduct govern, Defendants are obligated to pay Plaintiff a co-counsel referral fee in the approximate amount of $2,133,333, based on one third of the amount Defendants received in attorneys' fees.

127. As set forth at length below, Defendants wrongfully retained fees that should have been paid to Plaintiff and are therefore liable to Plaintiff for millions of dollars in fees collected in the Epp case.

**COUNT I**

**Plaintiff v. Defendants**

**CONVERSION**

128. Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

129. It is customary in Pennsylvania that an attorney who is referred a case owes the referring firm a referral fee.

130.    Plaintiff previously referred cases to Defendants and was paid a one third referral fee, establishing a course of dealing.

131.    Defendants were referred the Epp matter by Plaintiff and accordingly Defendants knew that they owed Plaintiff a referral fee.

132.    Defendants have failed and refused to pay a referral fee in excess of $2 million dollars in the Epp matter despite owing Plaintiff such a fee.

133.    Defendants have permanently misappropriated and converted fees belonging to Plaintiff for Defendants' own use and benefit without the authorization or consent of Plaintiff.

134.    As a direct and proximate result of this illegal conversion, Plaintiff has suffered financial injuries.

135.    Defendants' illegal conduct was intentional and illegal in violation of both State and Federal criminal law and was willful, malicious and outrageous, justifying the imposition of punitive damages.

WHEREFORE, Plaintiff hereby demands judgment in its favor and against all Defendants, in an amount in excess of $2 million dollars, together with interest, costs, punitive damages and grant such other relief as this Court deems to be just and proper.

## COUNT II
### Plaintiff v. Defendants
### FRAUD

136.    Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

137.    When Plaintiff, by and through De Llano, directly asked Defendant, by and thorough Morgan, about the Epp case in January 14, 2010, Morgan's failure to advise Plaintiff that Defendant was representing Epp was a material misrepresentation which was false when it was made.

138.    Alternatively, and to the extent Defendants contend that as of January 14, 2010 (the date Plaintiff made the inquiry regarding Epp) Defendants did not represent Epp, Defendants' intentional failure to notify Plaintiff of their subsequent representation of Epp, is a willful deceptive omission which constitutes a misrepresentation as Defendants were obligated to inform Plaintiff of the subsequent representation of Epp.

139.    During the time Defendants decided to represent Epp and exclude Plaintiff, Plaintiff and Defendants were actively working together as co-counsel on the Vanderslice and Galmines matters.

140.    There was simply no reason to fail to disclose this representation especially since Defendants would never have known about Epp but for Plaintiff's co-counsel referral.

141.    Defendants made this misrepresentation and/or omission in order to wrongfully evade the obligation to pay a referral fee to Plaintiff in order to enrich Defendants.

142.    Plaintiff justifiably relied on the misrepresentation and/or omission made by Defendants.

143.    Plaintiff suffered substantial economic damages as a proximate result of the misrepresentation/omission made by Defendants.

144.    Defendant's conduct was outrageous, wanton and willful, warranting the imposition of punitive damages.

WHEREFORE Plaintiff hereby demands judgment in its favor and against Defendants in an amount in excess of $2 million dollars, together with interest, costs, punitive damages and grant such other relief as this Court deems to be just and proper.

## COUNT III

### Plaintiff v. Defendants

### UNJUST ENRICHMENT

145.    Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

146.    Epp contacted Plaintiff for legal representation by and through Plaintiff's website.

147.    But for Plaintiff bringing Defendants into the Epp matter as co-counsel, Defendants would never have had the opportunity to represent Epp.

148.    Defendants wrongfully excluded Plaintiff from participating as co-counsel in the Epp matter.

149.    It would be inequitable and unjust to allow Defendants to keep the entirety of the legal fees in the Epp case without paying a referral fee to Plaintiff.

150.    As a result of Defendants' actions, Defendants have been unjustly enriched to the detriment of the interests of Plaintiff who has been damaged.

WHEREFORE, Plaintiff hereby demands judgment in its favor and against Defendants in an amount in excess of $2 million dollars, together with interest, costs and grant such other relief as this Court deems to be just and proper.

## COUNT IV

### Plaintiff v. Defendants

### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

151.    Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

152.    At the inception of their relationship, Plaintiff and Defendants agreed that in all referrals of cases that result in a recovery (whether by trial or settlement), a referral fee would be paid to the referring attorney.

153.   Indeed, the draft fee agreement sent to Epp confirmed the arrangement between Plaintiff and Defendant.  (*See* Ex. "9.")

154.   Epp contacted Plaintiff for legal services and Plaintiff brought Defendants into the case to further assist Epp.

155.   Thereafter, Defendants wrongfully severed the relationship between Epp and Plaintiff.

156.   Defendants' intentional interference and disruption of the contractual relationship between Plaintiff and Epp, severely damaged Plaintiff.

157.   Defendants' misconduct has been willful, intentional, malicious and outrageous, justifying the imposition of punitive damages.

WHEREFORE Plaintiff hereby demands judgment in its favor and against Defendants in an amount in excess of $2 million dollars, together with interest, costs, punitive damages and grant such other relief as this Court deems to be just and proper.

## COUNT V
### Plaintiff v. Defendants
### TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS

158.   Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

159.   As set forth above, to the extent it is determined that Epp was not in a contractual relationship with Plaintiff, Epp was a prospective contractual relation.

160.   Defendants' interference and disruption of the prospective contractual relationship between Plaintiff and Epp resulted in Plaintiff being severely damaged.

161.   Defendants' misconduct has been willful, intentional, malicious and outrageous, justifying the imposition of punitive damages.

WHEREFORE Plaintiff hereby demands judgment in its favor and against Defendants in an amount in excess of $2 million dollars, together with interest, costs, punitive damages and grant such other relief as this Court deems to be just and proper.

**COUNT VI**

**Plaintiff v. Defendants**

**BREACH OF CONTRACT**

162.     Plaintiff incorporates the preceding paragraphs as if set forth herein at length.

163.     Plaintiff and Defendants entered into an oral contract wherein it was expressly agreed that in return for referring a case that resulted in a recovery, Defendants would pay the Plaintiff a referral fee which amounted to 1/3 of Defendants' entire fee recovered.

164.     After Defendants recovered approximately $16,160,000 for Epp, Defendants would have been entitled to in of $6.4 million in fees.

165.     Defendants were also awarded an additional $1.15 million in legal fees, making their total fee in this matter in excess of $7.55 million.

166.     Pursuant to their oral agreement, Plaintiff is entitled to 1/3 of Defendants' fee, or approximately $2,133,333.

167.     Despite demand, Defendants have refused to pay referral fees to Plaintiff in breach of the oral agreement to pay said fees.

168.     Defendants' conduct violates the implied covenant of good faith and fair dealing implied in every agreement under Pennsylvania law.

WHEREFORE Plaintiff hereby demands judgment in its favor and against Defendants in an amount in excess of $2 million dollars, together with interest, costs, and grant such other relief as this Court deems to be just and proper.

**BOCHETTO & LENTZ, P.C.**

Date: June 18, 2018                    BY: _____

Gavin P. Lentz, Esquire
Jeffrey W. Ogren, Esquire
*Attorneys for Plaintiff,*
*Danziger & De Llano, LLP*